ETHEL CLOUGH ET AL. V. B. M. WORSHAM ET AL.

Decided April 8, 1903.

**1.—Official Bonds—Suit on by Private Individual.**

In the absence of a provision of law authorizing a suit by an individual upon an official bond payable to the State, such suit can not be maintained.

**2.—Negligence—Lunatic Asylum—Confining Lunatics Within Grounds.**

It is not negligence per se for the officers of the State Lunatic Asylum to permit inmates thereof to go outside the grounds on labor errands in charge of an attendant, since the statute, while requiring that they shall be restrained there, does not require that they shall be confined within the grounds. Rev. Stats., arts. 133, 135.

**3.—Lunatic Asylum—Power of Officers—Employment of Inmates.**

It was within the power of the board of managers and superintendent of the State Lunatic Asylum to arrange for the hauling of material for a new building by a part of the inmates of the asylum who, in the judgment of the medical staff, were fit for such work. Rev. Stats., arts. 93, 97, 101, 102, considered.

**4.—Same—Liability of Managing Officers for Acts of Subordinates—Respondeat Superior.**

The superintendent of the lunatic asylum is not liable for injuries to third persons resulting from the negligence of a ward physician of the institution in allowing an incompetent patient to be taken outside the grounds for the purpose of doing work, the superintendent having no personal knowledge of what inmate was selected for the work, and the instructions to the physician being to allow only such inmates to be taken for that purpose as were in suitable mental condition to do the work.

Appeal from the District Court of Travis. Tried below before Hon. R. L. Penn.

*Edwin H. Yeiser* and *J. Bouldin Rector,* for appellants.

*C. K. Bell,* Attorney-General, and *Fiset & Miller,* for appellees.

STREETMAN, ASSOCIATE JUSTICE.—Appellants Joe Clough and wife and their daughter Jennie Clough, a minor, suing by her father as next friend, brought this suit against B. M. Worsham individually and as medical superintendent of the State Lunatic Asylum at Austin, Texas, and the sureties upon his official bond, and against David Harrell and others as individuals and as members of the board of managers of said asylum, to recover damages on account of personal injuries sustained by said Ethel Clough.

It was alleged that said superintendent and board of managers had arranged to erect certain buildings on said asylum grounds, and had contracted with other parties for all of the work necessary upon said buildings, except the hauling of sand, and that they determined to use for the purpose of hauling such sand from the bottoms of the Colorado River and through the city of Austin, certain of the insane inmates of said asylum. That all of the inmates of said asylum were incompetent for said work, and that it was the legal duty of said defendants to restrain all of said persons within said asylum or upon the grounds thereof. That in violation of this duty the defendants permitted certain of said insane inmates, including one John Guinn, to go off of said grounds, and to drive a two-horse wagon and team through the streets of the city of Austin. That he, in company with four other of said insane persons, each driving a wagon under the direction of an attendant of said asylum, were proceeding through the streets of the city of Austin to the Colorado River, when the other four persons became separated from said John Guinn, and, in attempting to turn a corner and over-take the others, he drove his team recklessly upon the sidewalk, where said Ethel Clough was walking, and ran against her and inflicted upon her serious bodily injuries.

It was further alleged that in undertaking to perform this work in the manner alleged the defendants were acting without the scope of their official duties, and that they thereby undertook to do the work of con-tractors, thereby assuming the duties and responsibilities of such to the public.

The court sustained exceptions of the sureties upon the official bond of B. M. Worsham, and dismissed them from the case. Exceptions were also sustained to those portions of the petition which alleged that it was the legal duty of the defendants to confine and restrain said John Guinn and said other insane persons within the asylum or the grounds thereof.

The following facts were proved: "It was admitted that all of the defendants named in plaintiffs' second amended original petition were appointed or elected and duly qualified as officers of the Lunatic Asylum at Austin, Texas, as alleged in said petition, and were such officers on and prior to February 28, 1900; that John Guinn was convicted of lunacy by the County Court of Leon County, Texas, on or about the 17th day of September, 1895, and was committed to the asylum at Austin, Texas, and that he was the person driving and in charge of the wagon and team which plaintiffs alleged caused the injuries to Ethel Clough, on account of which this suit is brought.

"Plaintiffs then offered Dr. Worsham, who testified as follows: I am the superintendent of the State Insane Asylum at Austin. I was not connected with the institution when John Guinn was admitted, and do not know what his mental condition was at that time. I do not con-sider him sane at the present time, in the true sense of the word, but he has long since recovered from the acute attack of insanity that he had at the beginning of his trouble, but was left with a mind defective

to the extent that he has not been considered competent to manage his own affairs and earn a living. He was sent back to the county he was admitted from some four years back on a furlough for the purpose of testing his ability to earn a living, but he had to be returned. I think this was due to the fact that he had no one to render assistance in any way.

"Some time prior to February 28, 1900, the Legislature made an appropriation for the construction of some buildings at the asylum, and myself and the board had the letting of the contracts. On letting the contract with plans and specifications, we omitted the furnishing of sand on the part of the contractors. At a board meeting we discussed and formulated the plan of hauling sand from the bottoms of the Colorado River to the asylum, and using such of the inmates as would, in the judgment of the physicians in charge of the wards, be competent and suitable to do such work. All of the inmates are confined to the asylum, and were on February 28, 1900, on account of being insane. We use the inmates to do a great deal of the work about the asylum and to make a good many articles, such as beds, tables, etc., and find them skillful and good workmen.

"Cross-examination by defendants: In working the inmates of the asylum, the plan is for the manager or storekeeper to make requisition for such workmen as he wants for any particular piece of work upon the physicians in charge of the particular wards, and this physician then ascertains which of the inmates, if any of them, is in fit mental condition and competent to discharge that work, and each day he informs the manager or storekeeper what men can be employed at work outside of the wards. Dr. Ross was the physician in charge of the ward in which was John Guinn, and under the arrangement we had, before John Guinn would be allowed to go out of the ward to do work, Dr. Ross would have to grant permission. Neither the board nor myself had anything to do with determining whether or not John Guinn or any of the other inmates should be taken out of the ward and put to work by the manager or storekeeper, and none of us knew that Guinn was employed on the day that Ethel Clough was injured by the wagon and team that Guinn was driving. In pursuance of the plan that we had adopted to haul sand from the river, Dr. Ross was instructed by me to allow the manager or storekeeper to take out such of the lunatics as Dr. Ross, in his judgment, thought were in suitable mental condition to do the work, and it was under this arrangement that the teams went out to haul sand on or about February 28, 1900. The inmates, however, were not allowed to do this work, except under the control and charge of one James Patton, who always went with them, and was with them on the day in question. Sometimes, instead of one, two attendants would go along with the inmates, according to the number of inmates that were used in the work.

"My reason for using the inmates for doing work is that it is now considered by all authorities on insanity that employment in the open

air is the best possible means for treating an insane person, and it is the best possible means for treating an insane person, and it is the the constant effort in our asylum to give the inmates as much outdoor work as possible. We have 300 acres of ground for this purpose. They do all the gardening for the institution. I knew in a general way that John Guinn was frequently being used as a teamster and acquiesced in his employment, but his employment was always upon a request to the doctor in charge of his ward, who determined in his judgment as to whether on a particular day he was in proper condition to be allowed to go to work. I never directed any particular inmate to be taken out on any particular occasion, but left that for the doctor in charge of the ward.

"I think John Guinn on February 28, 1900, was entirely competent to do ordinary work, and was a good and skillful driver. He had been driving wagons at the asylum for years, and without any accidents. It is not unusual for insane persons to be thoroughly competent to do ordinary work, and yet be unfit to be turned out of the asylum as competent to manage their own affairs.

"Plaintiffs proved by other witnesses that on the 28th day of February, 1900, the wagon and team that was driven by John Guinn ran over and seriously and permanently injured Ethel Clough on First Street, in the city of Austin, Travis County, Texas; that at the time the wagon and team were being driven at a reckless rate of speed and in a reckless manner by said Guinn; that his team was separated by a considerable distance from the other asylum teams, and that the attendant Patton was in one of the wagons that was several blocks ahead of said Guinn, and that Ethel Clough was injured through the negligent driving of said Guinn; that her injuries have caused her great pain and suffering; that she had not recovered from them at the time of the trial, and was suffering with spinal trouble; that her parents, as a result of her injuries, have been deprived of her labor; that they were often compelled to be up with her at night to give her medicine and to attend to her because of said injuries; that they have expended about $100 for medicines and have incurred a doctor's bill, on account of the doctor's treatment of her, of $250, all of which medicine and treatment by the doctor was necessary, and that the prices charged for the same were reasonable."

After hearing the evidence, the court instructed a verdict for defendants, and from the judgment rendered thereon, plaintiffs have appealed.

The first assignment of error complains of the judgment sustaining the exceptions of the sureties upon the official bond of B. M. Worsham. The ruling of the court was correct. The bond was payable to the State of Texas, conditioned upon the faithful performance of his official duties. There is no provision of the law which authorizes a suit upon the bond by an individual; and, in the absence of such authority, it seems that such a suit can not be maintained. McRea v. McWilliams, 57 Texas, 328. If there had been error in this respect, however, it would be immaterial, in view of our disposition of the case as to the other defendants.

It is also insisted that the court erred in sustaining exceptions of the defendants to those portions of the petition which alleged that it was the legal duty of the defendants to confine and restrain all of the insane inmates of the asylum within the asylum itself or upon the grounds thereof. Appellants insist that whenever a person is found insane by a proper court, and committed to the asylum for restraint and treatment, that it is negligence per se for the authorities in charge of such asylum to permit such person to leave the asylum grounds.

We have carefully examined all of the statutory provisions bearing upon the subject, but we are unable to agree with this contention. It is true that, in order to admit a person as an inmate to an insane asylum, the court must find that he is of unsound mind, and that it is necessary that he should be placed under restraint, and the judgment of the court in such case is that he be conveyed to the lunatic asylum for restraint and treatment. Rev. Stats., arts. 133, 135. But we have found no provision of law which requires that such person must be confined within the walls or upon the grounds of such asylum. In this case it will be noted that the insane persons were not unrestrained at the time the injury occurred. If they had been permitted to leave the asylum or its grounds without any restraint whatever, a different question would be presented; but the question here presented is, whether it is a violation of legal duty to permit such persons to leave the asylum premises, even under restraint. There is no direct provision of the law to this effect, nor any provision from which such conclusion can be reasonably inferred; and, this being the case, we conclude that the Legislature only intended that such persons should be restrained, but that the character and extent of such restraint, and whether such persons should at all times be confined within the grounds of the asylum, was left to the discretion of the officials, upon whom the duty devolved.

We next reach the question whether the work which the defendants undertook was a part of their official duties. Article 93 of the Revised Statutes provides that the members of the board of managers shall have "the general direction and control of all the property and business of the asylums, in accordance with the requirements of law, and in all those cases not provided by law, they shall have such direction and control of the property and business of the asylums according to the by-laws, rules and regulations of the asylums."

Article 94 provides: "The board of managers shall have power to make all necessary by-laws and regulations not inconsistent with the Constitution and laws of this State, for the government of their institutions, officers, employes and inmates."

Article 97 provides for the election of a medical superintendent, and prescribes the qualifications of such officer.

Article 101 provides that "the superintendent shall be the chief executive medical and disbursing officer of the institution, and, subject to the by-laws, shall have general care and control over everything connected therewith."

Article 102 makes it his duty to "superintend repairs and improvements."

We are convinced that the powers and duties prescribed by these articles of the statute are sufficiently broad to fully include as a part of their official duties everything that was done by the superintendent and board of managers with reference to the matter under investigation.

Having determined that it was not negligence per se to permit said inmates to leave the asylum premises, and that the defendants were acting in the performance of their official duties, the only remaining inquiry is whether there was such evidence of negligence in the performance of these duties as should have been submitted to a jury.

If there was any personal default on the part of the superintendent or managers in the performance of their official duties, there might still be some question whether a private citizen could recover on account of injuries resulting from such official neglect, but the condition of the evidence does not require us to pass upon this question. The evidence discloses that neither the superintendent nor any of the board of managers personally selected John Guinn for the work in question, nor did they personally determine the number of attendants who should go with him.

The law recognizes the fact that the labor of managing an institution of this character is too great to be performed by a single individual, and that of necessity many of the duties must be delegated by the superintendent to subordinate officials. To this end article 102 of the statutes directs: "That the superintendent shall also, with the consent of the board of managers, employ such officers, attendants and other persons, as may be required for the service of the institution."

Under this authority the superintendent had employed Dr. Ross as the physician in charge of the ward which included John Guinn, and under their regulations the duty devolved upon him to determine when such inmates were in condition to be used in any character of work. In addition to this he had employed James Patton as an attendant, who went with such inmates, and the duty devolved upon him to exercise such restraint upon said inmates as might be necessary and proper.

If there was negligence, therefore, in selecting said Guinn for the work in question, it was the negligence of Dr. Ross, and if there was negligence in not exercising a sufficient restraint upon said Guinn, it was the negligence of said attendant. It is not alleged that Dr. Worsham was negligent in employing either Dr. Ross or the attendant Patton. The question is, therefore, whether, under these circumstances, Dr. Worsham was responsible for injuries resulting from the negligent performance of their official duties by either of these subordinate officials.

Judge Story upon this question announces the rule as follows: "It is plain that the government itself is not responsible for the misfeasances or wrongs, or negligences or omissions of duty of the subordinate officers or agents employed in the public service, for it does not undertake to guarantee to any persons the fidelity of any of the officers or agents whom

it employs; since that would involve it in all its operations in useless embarrassments and difficulties and losses which would be subversive of the public interests; and indeed, laches are never imputable to the government. Our next inquiry, therefore, is whether the heads of its departments or other superior functionaries are in a different predicament. And here the doctrine is now firmly established, that public officers and agents are not responsible for the misfeasances or positive wrongs, or for the nonfeasances or negligences or omissions of duty, of the subagents or servants or other persons properly employed by and under them, in the discharge of their official duties. * * * The rule which we have been considering, that where persons are acting as public agents they are responsible only for their own misfeasances and negligences, and not for the misfeasances and negligences of those who are employed under them, if they have employed persons of suitable skill and ability, and have not co-operated in or authorized the wrong, is not confined to public officers or agents of the government in a strict legal sense; but it applies equally to other public officers or agents engaged in the public service or acting for public objects, whether their appointments emanate from particular public bodies or are derived from general laws, and whether those objects are of a local or of a general nature. For if the doctrine of respondeat superior were applied to such agencies, it would operate as a serious discouragement to persons who perform public functions, many of which are rendered gratuitously, and all of which are highly important to the public interest." Story on Agency, secs. 319, 321.

The doctrine here announced is not only founded upon sound considerations of public policy, but is amply supported by authority, and we think the facts of this case call for its application.

We have not considered the assignments of error in detail, but our conclusions above stated dispose of all the questions presented. There being no error in the judgment, it is affirmed.

*Affirmed.*

Writ of error refused.